State v. Albright.

---

THE STATE v. ALBRIGHT, *Appellant.*

Division Two, June 14, 1898.

1. **Criminal Law**: CHANGE OF VENUE. The ruling of the trial judge on defendant's application for a change of venue will not be disturbed, unless the circumstances of the case are of such a nature as to indicate an abuse of his discretion.

2. ———: CHALLENGE OF ARRAY. Where the *venire facias* is directed to the sheriff, it does not have to be in the hands of the deputies who assist the sheriff in summoning the number of jurors specified therein.

3. ———: STATUTE: SUMMONING JURORS. The statute regulating the summoning of jurors is directory.

4. ———: CHALLENGING JUROR. The exact ground of the incompetency of a juror should be stated. The mere challenge "for cause" amounts to nothing. (Following *State v. Taylor*, 134 Mo. 109.)

5. ———: INSTRUCTION ON ALL POINTS.  Unless the defendant at the time calls the court's attention to the fact that it has not instructed on the issues involved, specifying them, an assertion in a motion for a new trial that the court did not instruct on all questions of law involved in the case, will avail nothing.

6. ———: THREATS: "DEAD OR ALIVE."  It is not a threat for one authorized to make arrests to state that he will take another charged with murder "dead or alive."

7. ———: ARREST BY A PRIVATE PERSON.  Where a private citizen without a warrant has good cause to arrest one charged with a felony, and such felon has been informed of his intention to do so, the private citizen has authority to make the arrest and if he is killed by the felon in the attempt, it is murder.  And if such felon knows that the intention of the private citizen in coming to the house in which he is, is to arrest him, such private person has the right to break open the door and enter for the purpose of making the arrest.

8. ———: ———: THREATS: SELF-DEFENSE: INSTRUCTIONS.  And if under such circumstances the private citizen is shot down by the felon no instruction should be given at his trial in reference to self-defense or threats, where the "threats" were a statement to a third party by the prosecuting attorney (who was the private citizen in this case) that he would come and arrest the defendant "dead or alive," accompanied with a request to "tell him to come in and give himself up like a man."  Nor should any instructions be given for murder of a less degree than in the first.

9. ———: ———: MANSLAUGHTER.  Where a private citizen has the right to arrest a felon, no instruction should be given for manslaughter on the trial of the felon for killing such private citizen while attempting the arrest, nor for any degree of murder less than murder in the first degree.

10. ———: RESISTING ARREST: HOT BLOOD.  "Hot blood" or "heat of passion" can not be engendered in a felon by one making or attempting a lawful arrest of him.

*Appeal from Mississippi Circuit Court.*—HON. HENRY C. RILEY, Judge.

AFFIRMED.

*H. C. O'Bryan* for appellant.

Edward C. Crow, Attorney-General, J. J. Russell and W. G. Lee, for the State.

(1)    The objection to this juror was a mere general challenge. This being so, the case falls clearly within the rule announced in cases of State v. Taylor, 134 Mo. 109, and State v. Dyer, 139 Mo. 199. The trial court was entitled to know the exact ground of objection to this juror, and should have been afforded an opportunity to pass upon the question now presented to this court. (2) The circuit court did not err in overruling defendant's application for change of venue in July, 1897. The finding of the trial court on this issue of fact will not be disturbed in the absence of a showing that there was palpable abuse of discretion. State v. Dyer, 139 Mo. 199; State v. Holcomb, 86 Mo. 371. (3) There was no error committed in overruling defendant's motion to quash the panel of one hundred special jurors, because they had been selected without a writ of venire facias. R. S. 1889, sec. 4206; 71 Mo. 446; 82 Mo. 626. (4) Statutes relating to the empaneling of juries in criminal cases are directory merely, and the fact of a violation of the provisions of such statute is not ground for reversal of judgment, unless prejudice to the appellant is fairly inferable from the circumstances of the case. State v. Ward, 74 Mo. 253; State v. Breen, 59 Mo. 413; State v. Pitts, 58 Mo. 556. (5) Death resulting from the resistance of lawful arrest will be murder. State v. Green, 66 Mo. 631; Minard v. Comm., 87 Ky. 217; Washington v. State, 1 Tex. App. 647. And it is immaterial whether the person arrested is guilty of the crime charged or not. Roten v. State, 31 Fla. 514. It will be equally murder to kill a private person making an arrest where the circumstances authorize the arrest by such person.

*Snelling v. State*, 87 Ga. 850; *State v. Mowry*, 37 Kan. 369; 1 McLain, Crim. Law, sec. 328. (7) An individual may, acting in good faith, arrest a particular person for having committed a felony on an occasion already past. *State v. Roberts*, 14 Mo. 138; *U. S. v. Boyd*, 45 Fed. Rep. 851; *Wrexford v. Smith*, 2 Root (Conn.), 171; *Law v. State*, 12 Ga. 293; *Doering v. State*, 49 Ind. 56; *Burns v. Erban*, 40 N. Y. 463; *State v. Roane*, 2 Dev. (N. C.) 58; *State v. Mowry*, 37 Kan. 369; *Lander v. Miles*, 3 Ore. 35; *Brooks v. Com.*, 61 Pa. St. 352; *Kennedy v. State*, 107 Ind. 144. (8) In order to justify such an arrest it must be proved that the felony was actually committed and that there was reasonable ground for suspecting the person arrested. *State v. Underwood*, 75 Mo. 230; *Carey v. State*, 76 Ala. 78; *Carr v. State*, 34 Ark. 99; *Long v. State*, 12 Ga. 293; *Roan v. State*, 42 Ind. 56; *Com. v. Presby*, 14 Gray (Mass.), 65; 2 Am. and Eng. Ency. of Law [2 Ed.], 885.

SHERWOOD, J.—Murder in the first degree the charge and verdict returned also for that degree. George S. Elliott was the victim of the deed, and a shotgun the weapon. He had been prosecuting attorney of the county and drew the indictment against defendant and the brother of the latter, Joseph, for the murder of one Isaac Large, which indictment was found at the December term, 1896; and was such prosecuting officer at the time he met his death on the twelfth day of January, 1897, in the attempt to arrest defendant under the charge contained in the indictment aforesaid.

Looking through this record, various objections are made and exceptions are saved, which, in the absence of any brief or assignment of errors in this court, must serve the purpose of such assignment.

1. And, first, as to denying defendant's application for a change of venue. The evidence in favor of and against the application was heard by the trial court, and having been determined adversely to granting the change, such ruling will not be disturbed by this court and should not be unless there had been circumstances of such a nature as indicated an abuse of the discretion lodged in the trial court, something which is not to be found in the present record. *State v. Dyer*, 139 Mo. 199.

2. The written challenge to the array was properly overruled, because it was sufficient that the *venire facias* for one hundred men was directed to the sheriff of the county and it did not have to be in the hands of the deputies, both of whom assisted the sheriff in summoning the number of jurors specified in the venire; and this was the ground of the challenge. And besides, the statute regulating the summoning of jurors has always been construed merely as directory. *Samuels v. State*, 3 Mo. 68; *State v. Pitts*, 58 Mo. 556; *State v. Jones*, 61 Mo. 232; *State v. Knight, Ib.* 373; *State v. Williams*, 136 Mo. *loc. cit.* 307, and cases cited.

3. As to the juror Bennett, one of the panel of forty from which defendant was to make his challenges, he was a competent juror under the ruling of this court in *State v. Taylor*, 134 Mo. 109; *State v. Dyer*, 139 Mo. 199. And if he was not a competent juror the exact ground of his incompetency should have been pointed out; the mere challenge "*for cause*" amounted to nothing. *Ib.*

4. The instruction given by the court embraced murder in the first and second degrees, and also self-defense, and the effect to be given to threats alleged to have been made by Elliott against defendant, and taken as a whole follows approved precedents, and

contains no seriously prejudicial error. It is asserted in the motion for a new trial that the court did not fully instruct on all questions of law, etc.; but this criticism can not prevail, because defendant did not at the proper time call the attention of the court to such omission, and except on the refusal of the court to supply such omission, if any existed. *State v. Williams*, 136 Mo. 293, and numerous other cases inclusive of *State v. Cantlin*, 118 Mo. 100.

5. The main and most important question involved in this record is now to be considered; it is as to the power of a citizen to arrest one charged with a felony. Intimately associated with this question, however, is the testimony of witnesses on behalf of defendant, which it is said shows threats made by Elliott against defendant, which testimony will now be set forth: *Shankle* testified: "Well, I think the best I remember it was about the 8th, the 7th or 8th, of January, that I met Mr. Elliott. I also met Mr. Albright the same day, James Albright the same day I met Mr. Elliott. I had a conversation with Mr. Albright and Mr. Albright agreed with me to come to town and give up . . . if there was reward for him, and offered to divide the reward with me, providing there was a substantial reward, if it was good; and asked if I would see the sheriff of this county and see if it was good. I told him I would. I came to town and not finding the sheriff, not knowing him I didn't find him. At the time I saw Mr. Elliott, I told him I wanted to see the sheriff, and also him. He says he would go to the sheriff's office, either to his office or to the sheriff's office, I would not be positive which. We went to the office anyway in this building here. I don't know whether it is the sheriff's office or Mr. Elliott's office, and the sheriff was not in, and Mr. Elliott said the sheriff was not there; he asked me my business; I

told him my business. I told him what Mr. Albright told me; and Mr. Elliott just simply remarked to me that he would not give anything for the arrest of Albright and would not be the cause of anything being spent; that he knew where he was; that when he got able or time, I would not be positive which, that he would go out there and get him. He says, 'I mean to get him—I mean to get him dead or alive,' they are the words that he spoke to me; and asked if I would be kind enough to him to tell Jim Albright to come in and give up like a man, and if he didn't that he would come out there and get him either dead or alive. They are the words that he told me, and I told Albright that evening of the same day what Elliott told me. That is all I know.''

*Madrey*, in his deposition taken in Tennessee, states that he had a conversation with George S. Elliott in Charleston, Missouri, about the twenty-fourth of December, 1896, in regard to defendant; that in that conversation the following occurred: ''I asked him to raise a reward, and he said we have nothing to do with that; that I am going out after him in a few days, and all I want is to get a shot at him. I will bring him in. I don't care just so he can be identified, how he is. That was all the conversation I remember of.'' And that witness informed defendant of this conversation in about a week after its occurrence.

Defendant in reply to direct and answer-indicating questions, testified that Shankle and Madrey had both told him that Elliott had threatened his life. If, however, the testimony of Shankle, a witness for defendant, be true, and it is not denied by defendant, there was no threat couched in the language used by Elliott to him, provided always that Elliott had the legal right to arrest defendant, because the power to make the arrest necessarily implies the power to take the person

to be arrested "dead or alive." We are thus brought to consider the power of a private citizen, unarmed with a warrant, to make an arrest where a felony is charged.

We gather from the authorities that a private person may arrest another in treason or felony: "If in fact there has been an offense of either of these degrees committed, and the private person on reasonable grounds suspects a particular individual, he, acting in good faith, may arrest him without incurring any liability, civil or criminal, should the suspicion prove unfounded." Bishop, New Crim. Proc., sec. 168, and cases cited. Some of the cases seemingly intimate that an arrest in such circumstances is not justifiable unless the person arrested be proven *guilty;* but this is not the prevalent doctrine. *Ib.* To the same effect, see 2 Am. and Eng. Ency. of Law [2 Ed.], p. 885, and cases cited.

HALE says: "If A., a mere private man, knows B. to have committed a felony, he may thereupon arrest him of felony, and he is lawfully in the custody of A. till he be discharged of him by delivering him to the constable or common goal; and therefore if he voluntarily suffers him to escape out of his custody, though he were no officer, nor B. indicted, it is felony in A. So it is, if a felony be in fact committed, and A. hath a probable cause to suspect B. and accordingly suspects and arrests him, B. is lawfully in the custody of A. for suspicion of felony; and if he voluntarily lets him escape, it is felony in A. *in eventu viz.*, if B. proves really guilty of the felony." 1 Hale, P. C. 595.

"If A. commit a felony, B., who is a private person, may arrest him for that felony without any warrant; nay, farther, if A. will not suffer himself to be taken, but either resists or flies, so that he can not be taken, unless he be slain, if B. or any in assistance in that

case of necessity kill him, it is no felony; *de que antea*, p. 481.   If A. commit a felony in the sight of B. and B. uses not his best endeavors to apprehend him, or to raise hue and cry upon him, it is punishable by fine and imprisonment. . . . . . . .  If a felony be committed, in fact, and A. suspects B. did it, and hath probable cause of suspicion, A. may arrest B. for it and justify it in an action of false imprisonment.   2 E. 4, 8, B. . . . . . . . If a felony be committed and A. suspects B. and B. being in his house refuse to open the doors, or render himself, it seems A. may break open the doors to take him; and so may the constable, if A. acquaint him therewith, especially if A. be present. 13 E. 4. 9. a. tho (as hath been said) my Lord COKE, 4 Inst. 177, be to the contrary, yet the common practice and opinion hath obtained in that case against my Lord COKE. Dalt cap. 98. p. 249, cap. 78, p. 204, 7 E.3.16 b.'' *Ib.* p. (588).

Elsewhere the same author states: ''And now therefore I come to consider touching the arrests by a private person in case of felony.   And this is of these kinds. 1.   Where the party arrested hath really committed a felony, and this is known to the party arresting.   2.   Where the party arrested hath really committed a felony, but it is only suspected, and not certainly known to the party arresting.   3.   Where there hath been a felony committed, and the party arresting doth, upon probable grounds, suspect the person arrested to have committed it, tho in truth he did it not.

''*First.*   As to the first of these, where a person hath committed felony and A. knows it.   It is true in this case, if the time and nature of the fact, and the condition of things will bear it, it is best to complain to a justice of peace, and have his warrant, etc. . . . ; but such the case may be, that the delay that must arise neces-

sarily by these solemnities, may give the felon oppor-
tunity to escape; and therefore in this case A. without
any other authority than what the law gives him, may
arrest or apprehend the felon. . . . . . . . And as a
private man may do this upon a felony committed, so
if he see danger of murder by a dangerous wound
given, he may pursue the offender. 7 E. 3. 16
Barre, 291. And in both these cases, he may break
open doors, if he be denied entrance, and if *de
facto* the felon or malefactor be there, for the law
makes him an officer in this case, as well as if he were
a justice of peace or constable. 7 E. 3. 16. b. Nay
yet further, if the felon resists or flies, so that he can
not be taken without killing him, this is justifiable,
and no felony; but still it must be where he can not
be otherwise taken, for it is for advancement of justice,
and suppression of felons, and therefore if they can
not be otherwise apprehended, it is lawful, as well as
if A. were a constable, or had a warrant; and if the
books that speak of this matter, be but carefully exam-
ined, it will appear that the law was so generally
taken, tho he were pursued or taken without any
formal process to the sheriff. . . . . . . .

"*Second.* As to the second case, viz., where a
felony is committed by B., but A. that arrests him,
doth not certainly know it, as not being present at the
committing of it, I take the law to be all one with the
former case, only what he doth herein he doth at his
peril; for if in truth B. be a felon, then A. may arrest
him, and may break a house to arrest him, if he be
within the house, and refuses to render himself; yea,
and if he will not suffer himself to be taken, he may in
case of necessity be killed; but this still is at the peril
of A. for if he be no felon, it may be manslaughter at
least in A. if he doth it. But how far forth this will be

justifiable in case that A. hath a good cause of suspicion, will be considerable in the next inquiries.

"*Third.* The third case is, there is a felony committed, but whether committed by B. or not, *non constat,* and therefore we will suppose, that in truth it were not committed by·B. but by some person else, yet A. hath probable causes to suspect B. to be the felon, and accordingly doth arrest him; this arrest is lawful and justifiable, and the reason is, because if a person should be punished by an action of trespass, or false imprisonment for an arrest of a man for felony under these circumstances, malefactors would escape to the common detriment of the people. But to make good such a justification of imprisonment, (1) there must be in fact a felony committed by some person; for were there no felony, there can be no ground of suspicion. Again (2) the party (if a private person) that arrests, must suspect B. to be the felon. (3) He must have reasonable causes of such suspicion, and these must be alleged and proved." 2 Hale, P. C. (76), (77), (78).

And "for the arresting of the body of a man by a private person, there must be some just cause or some lawful and just suspicion at least; and, therefore, when a man is *indicted* of felony, that is a good cause for *any man* to arrest him." Dalton, ch. 170, sec. 5.

Touching this subject of arrest by a private person, BEDLE, J., says: "A private person is justified in arresting when a felony has actually been committed and there is probable ground to fairly suspect the person guilty." *Reuck v. McGregor*, 32 N. J. L. 70.

TINDAL, J., in *Allen v. Wright*, on this point gave this charge to the jury: "Where it appears, 1st, that a felony had actually been committed; 2nd, that the circumstances were such that you yourselves, or any reasonable person, acting without passion and prej-

udice, would have fairly suspected plaintiff of being the person who did it," etc. 8 C. and P. 522. See, also, *Beckwith v. Philby*, 6 B. and C. 635, where the same doctrine is announced by Lord TENTERDEN, C. J.

In the case of an officer, as sheriff and the like, the law enjoins on him as a duty to make arrest of one who has committed a felony, or one whom he has reasonable cause to suspect of having been guilty of a felony. 2 Hale, P. C. (85), (86).

The chief distinction between an officer and private person making an arrest in the circumstances above mentioned, is that in the former case the making an arrest is a matter *of duty*; in the latter, a matter of mere *right*. The only exception where it becomes the duty of a private person to arrest or attempt to arrest a felon, is where the felony is perpetrated in his presence. 1 Hale, P. C. 588, *supra*. Otherwise the officer and the private person stand on the same footing, and are equally under the special protection of the law when making or attempting an arrest. And it is said that a private person when making an arrest for a felony, must notify the felon of his purpose and that having thus notified the felon, he may kill him if he either resists or flies. *State v. Bryant*, 65 N. C. 327.

But it is said that if the felon have notice, *aliunde*, of such intended arrest, that this suffices. *Croom v. State*, 21 Am. St. Rep. 179. Thus in Georgia, where one occupying the position of a private citizen attempts without warrant to arrest one charged in an indictment with a felony, the indictment being found three years before, but when all the circumstances showed that the defendant must have anticipated the arrest and realized the intention of the party attempting the arrest, and the defendant fired on the party attempting his arrest and killed him, it was held that the defendant was justly found guilty of murder. *Snelling v. State*, 87 Ga. 50.

With the law announcing the foregoing principles, let us briefly recite the prominent facts of this record. Elliott had "good cause" to arrest defendant, as he as prosecuting attorney had signed the indictment charging defendant and his brother with the murder of Large on the twelfth of October, 1896, since which time defendant had evidently been in hiding, and the officers of the county do not seem to have been very vigilant in endeavoring his arrest. Defendant, as already indicated, knew that Elliott would attempt his arrest and had known it, as he testifies, for some two weeks before the twelfth of January, 1897. On the day that Elliott and Elkins went out in search of him he was aware of their coming and when they arrived in the neighborhood, he was at James Mattingley's house; saw them pass on to his father's not a fourth of a mile away, and went and borrowed a double barreled shot gun and seven shells of Mrs. Langston who lived about a mile distant, telling her if he did not get into trouble he would return the gun that night, and that he intended to ride that night, presumably meaning that he intented to leave the country. Obtaining this gun, etc., he returned to James Mattingley's house, went into the house, seated himself in a chair in the dining room which was just behind the front room with the gun across his lap, and went to playing a French harp. Meanwhile Elliott and Elkins had gotten through the search which they made for defendant at his father's house which was in speaking distance of Mattingley's house and started over to Mattingley's house. Elliott was armed with a revolver and Elkins with a shot gun. Pretty soon they arrived at Mattingley's house and Elliott directing Elkins to go around to the rear of the house in order to cut off defendant's escape, Elliott then went to the front room door and knocked, when

defendant said to Jimmy Mattingley: *"There is those men going to arrest me;"* got up from his seat, went into the front room within about eight or ten feet of the door which was closed, and fired through the door, making a large hole in it with the load of number five shot with which the gun was loaded, and inflicting a mortal wound on Elliott from which he died on the next day. So close was the gun to the door, that a part of the gun wad was blown into the wound. Defendant after firing through the door at Elliott, went into the diningroom and fired an ineffectual shot at Elkins through a back window. Elliott, notwithstanding his grievous wound, succeeded in entering the house and fired at defendant twice with his revolver, but without effect, and received in return from defendant a shot wound in the left arm. Defendant on his part, testifies that Elliott was trying to break open the front door at the time he fired the fatal shot, and that Elliott had his revolver in his right hand at that time.

6. Under the authorities cited, Elliott had the right to break open the door instead of merely knocking at it, as Jimmy Mattingley says he only did. And defendant knew for what purpose Elliott came to the door, as his statement made to Jimmy Mattingley shows; and this statement not having been denied by defendant, must be taken as conclusively true. *Payne v. Railroad*, 136 Mo. *loc. cit.* 594, and cases cited; *People v. Dyle*, 21 N. Y. 578.

7. Relative to the threats said to have been made by Elliott against defendant, it seems very singular that Elliott should have made them, and still at the same time asked Shankle "if he would not be kind enough to him to tell Jim Albright to come in and give up like a man." Defendant does not deny that Shankle delivered this message as sent to him as stated by Shankle, and therefore Shankle's statement is to be

taken as true. As before stated, we find nothing in the message sent by Shankle which amounts to a threat against defendant's life, unless that can be deemed a threat which announces a purpose which the law authorizes and sanctions. And it is very singular, also, that Elliott should threaten defendant's life, when, as the latter states, they "*were very close friends.*" But it is wholly immaterial whether Elliott made threats of the character indicated or not, because threats can have no relevancy unless in connection with the question of self-defense, and that right does not begin until some overt act is done which renders the danger immediate. 1 Bishop, N. Crim. Law, sec. 842.

In this case, though it is said Elliott had his revolver in his right hand while with his left he tried to open the door, yet he was unaware that defendant was in the house and of course could not have done any overt act at the time he was shot. In the circumstances detailed in evidence, Elliott was as much slain from ambush as if he had been fired on by one in concealment by the wayside. We therefore hold that no instructions should have been given in relation to either threats or self-defense.

8. Thus removing all questions out of the way respecting self-defense, we have left the case of a private citizen proceeding after due notification to, and full knowledge on the part of, a felon, to arrest him. Inasmuch as a citizen in such circumstances is as much within the special protection of the law, as an officer in like case, the killing of Elliott was nothing less than *murder in the first degree* and therefore no instruction for murder of a less degree should have been given, and this apart from other considerations already mentioned in the next preceding paragraph.

9. An instruction was asked by defendant in

regard to manslaughter. This was properly refused on grounds already stated and for these further reasons: If, as declared by the authorities heretofore cited and quoted, Elliott had the *right* to arrest defendant, then clearly defendant had no right to resist such arrest, unless it be true, which is not true, that two coexistent rights can conflict with each other, which is an impossible supposition.

Elliott then, possessing the right to make the arrest, it at once became defendant's duty to submit. Where such duty exists, hot blood can not be engendered by making or attempting a lawful arrest, because in such case "passion is wickedness and resistance crime." *Brooks v. Com.*, 61 Pa. St. 352; *State v. Duncan*, 116 Mo. *loc. cit.* 312.

Holding these views and finding no reversible error in the record, we affirm the judgment and direct the sentence pronounced by the law to be executed. All concur.